*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0379p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

In re: THOMAS CLYDE BOWLING, JR.,
*Movant (04-6194).*

---

THOMAS CLYDE BOWLING, JR.,
*Petitioner-Appellant (04-6378),*

*v.*

GLENN HAEBERLINE, Warden, Kentucky State Penitentiary,
*Respondent-Appellee.*

Nos. 04-6194/6378

Filed: September 7, 2005

Before: MOORE, GILMAN, and GIBBONS, Circuit Judges.

---

## ORDER

---

JULIA SMITH GIBBONS, Circuit Judge. Thomas Clyde Bowling, Jr., a Kentucky death row inmate represented by counsel, applied for leave to file a second or successive petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2244. He asserts that he is mentally retarded and therefore ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). Bowling also appeals from a federal district court order denying his motion for relief from judgment pursuant to Fed. R. Civ. P. 60(b). He seeks a certificate of appealability, arguing that his ineffective-assistance-of-counsel claim and his *Brady* claim should be reopened. We construe his request for a certificate of appealability as an application for leave to file a second or successive petition for a writ of habeas corpus. For the following reasons, we deny both of Bowling's applications to file a second or successive habeas petition.

### I.

In December 1990, a Kentucky state jury tried and convicted Bowling of two counts of murder in the deaths of James and Tina Early. The trial court sentenced him to death. The Supreme Court of Kentucky affirmed the convictions and sentence on direct appeal. *Bowling v. Commonwealth*, 873 S.W.2d 175 (Ky. 1993). In October 1996, the trial court denied Bowling's petition for post-conviction relief under Ky. R. Crim. P. 11.42. The Supreme Court of Kentucky

affirmed the trial court's decision on appeal. *Bowling v. Commonwealth*, 981 S.W.2d 545 (Ky. 1998).

In August 1999, Bowling filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in federal district court. Without ordering an evidentiary hearing, the district court denied the petition, and this court affirmed the district court's opinion. *Bowling v. Parker*, 138 F. Supp. 2d 821 (E.D. Ky. 2001), *aff'd*, 344 F.3d 487 (6th Cir. 2003), *cert. denied*, 125 S. Ct. 281 (2004).

Bowling subsequently filed an action in Fayette Circuit Court against Warden Glenn Haeberline, claiming that he is exempt from the death penalty because he is mentally retarded. *Bowling v. Commonwealth*, 163 S.W.3d 361, 364 (Ky. 2005). The circuit court summarily dismissed his petition, concluding that Bowling could not collaterally attack his death sentence through a civil action and that he had not timely asserted his mental retardation claim. *Id.* at 365. Bowling appealed to the Kentucky Supreme Court. The Kentucky Supreme Court held that Bowling procedurally defaulted his claim that he is mentally retarded because he could have asserted such a claim at trial given that Kentucky had in place at that time a statute prohibiting the execution of the mentally retarded. *Id.* at 371-72. It further determined that Bowling could not make a prima facie showing that he is mentally retarded because his I.Q. scores were higher than what Kentucky law considers to be "significantly subaverage intellectual functioning." *Id.* at 384.

While the Kentucky state court action was ongoing, Bowling filed an application for leave to file a second or successive petition for a writ of habeas corpus with this court. In his application, he asserts that he is actually innocent of the death penalty because he is mentally retarded. He also filed a Rule 60(b) motion to reopen his first habeas corpus proceeding in the United States District Court for the Eastern District of Kentucky. The district court denied the motion, and Bowling filed a request for a certificate of appealability with this court.

## II.

An application for permission from this court to file a second or successive habeas petition must not involve a claim that has been raised in a previous habeas petition. 28 U.S.C. § 2244(b)(1). A new claim will not be allowed to proceed unless:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (B)(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* § 2244(b)(2). In order for this court to grant permission to file a second or successive habeas petition, the applicant must make a prima facie showing that his application satisfies the statutory requirements. *Id.* § 2244(b)(3)(C). A prima facie showing requires the presentation of "sufficient allegations of fact together with some documentation that would 'warrant a fuller exploration by the district court.'" *In re Lott*, 366 F.3d 431, 433 (6th Cir. 2004) (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)).

Bowling's claim that he cannot receive the death penalty because he is mentally retarded rests upon the new rule established in *Atkins*, in which the Supreme Court held that the execution

of a mentally retarded offender violates the Eighth Amendment. 536 U.S. at 321. This rule has been made retroactive to cases on collateral review. *See Hill v. Anderson*, 300 F.3d 679, 681 (6th Cir. 2002).

In order for this court to grant Bowling a second or successive habeas petition, Bowling must present "sufficient allegations of fact together with some documentation" of his claim that he is mentally retarded. *See Lott*, 366 F.3d at 433; *In re Holladay*, 331 F.3d 1169, 1174 (11th Cir. 2003) (establishing that the motion should be granted allowing petitioner to file a successive habeas petition, "if petitioner's proofs, when measured against the entire record in this case, establish a reasonable likelihood that he is in fact mentally retarded"). Thus, the key substantive question before this court is whether Bowling was mentally retarded at the time he committed the murders of James and Tina Early.

*Atkins* did not set forth a definitive rule or procedure for the courts to follow in determining when an offender is mentally retarded such that his or her execution would violate the Eighth Amendment. Instead, *Atkins* reserved for the states "the task of developing appropriate ways to enforce the constitutional restriction" upon the execution of sentences. 536 U.S. at 317.

*Atkins* specifically observes that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus" against execution. *Id.* Those who are mentally retarded will have "significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Id.* at 308 n.3 (quoting American Association on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed. 1992)). Further, mental retardation will manifest before the person reaches eighteen years of age. *Id.*

Kentucky law began prohibiting the execution of "seriously mentally retarded" defendants twelve years prior to *Atkins*. Ky. Rev. Stat. § 532.140. It defines "seriously mentally retarded" as one who has "significant subaverage intellectual functioning existing concurrently with substantial deficits in adaptive behavior and manifested during the developmental period." *Id.* § 532.130(2). "Significant subaverage intellectual functioning" is defined as "an intelligence quotient (I.Q.) of seventy (70) or below." *Id.*

The evidence before this court strongly suggests that Bowling is not mentally retarded. Thus, Bowling does not make a prima facie showing on his claim of mental retardation such that he can receive permission to file a second or successive habeas petition.

Bowling has had four I.Q. tests – two were taken while he was in grade school and the other two were taken in preparation for his trial. While Bowling was in seventh grade (1966-67 academic year), he received scores of 74 and 79 on these tests. He was tested again twice in 1990, with both tests administered within a month of his December 1990 trial. He received a score of 86 using the WAIS-R test and a score of 87 on the Shipley Hartford Intelligence Scale. None of these scores are at or below the cutoff of 70 established by Kentucky law as proof of significant subaverage intellectual functioning. Further, in a separate case, the Kentucky Supreme Court determined that I.Q. scores of 74 and 78, similar to two of Bowling's scores, "are 4 to 8 points respectively higher than the definition of a seriously mentally retarded offender" who would be ineligible for the death penalty. *Woodall v. Commonwealth*, 63 S.W.3d 104, 116 (Ky. 2002).

Bowling argues that this court should not consider the absolute scores on these I.Q. tests, but instead apply a five-point margin of error. The five-point margin of error does place one of Bowling's seventh-grade scores below the statutory cutoff. However, Bowling does not justify the

five-point margin of error with any explanation nor does the margin of error appear to derive from any particular source. In addition, there is no indication that the psychologists who administered the I.Q. tests to Bowling would not have already considered the adequacy and accuracy of the testing mechanisms in calculating his scores or in using these instruments for evaluation in the first place. *See United States v. Roane*, 378 F.3d 382, 409 (4th Cir. 2004) (in rejecting the argument that defendant's I.Q. score should be considered within the range for those with mental retardation because of I.Q. score variations, the court observed that the psychologist's care in calculating a score "belies the suggestion that [the psychologist's] analysis did not account for possible variations in his testing instrument"). Finally, the I.Q. scores on the tests taken around the time of Bowling's trial were 86 and 87, scores that are significantly higher than the Kentucky statutory cutoff of 70 even taking into account Bowling's suggested five-point margin of error.

Bowling also argues that his academic performance indicates that he is mentally retarded. According to Bowling, his "grades were deplorable–mostly D's and F's," and he "was recommended for special education as early as the first grade, failed the second grade, and dropped out of school after spending nearly three years in the ninth grade." It is true that Bowling failed the ninth grade three times before leaving school. However, the record reflects that, between the third and sixth grades, Bowling received mostly C's and did not fail a class. School records do not indicate that Bowling ever took special education classes. In addition, a teacher commented during Bowling's eighth-grade year that "[t]his child is a slow learner; however, if a genuine interest is taken in him, he will perform and behave more satisfactorily. With guidance, his potential as a student will improve." Thus, while Bowling's academic performance was not exceptional, it does not follow from the evidence before this court that he is mentally retarded.

Bowling also presents the affidavits of his mother, sister, and son to establish that he was deficient in adaptive skills and unable to function in the basic aspects of everyday life. Iva Lee Bowling, his mother, stated that Bowling was slow in learning to walk and in becoming toilet trained, that he had scarlet fever when he was three years old, and that he had multiple head injuries as an infant and a teenager. She also stated that Bowling wandered off as a child and teenager, got into fights, and was a follower. According to his mother, he had problems with money, difficulty in keeping jobs, and difficulty maintaining personal relationships. Patricia Gentry, Bowling's sister, and Thomas Jason Bowling, Bowling's son, reiterated these and similar observations.

These limitations do not state a prima facie case for Bowling's mental retardation claim. Bowling's known, diagnosed psychological problems include attention deficit hyperactivity disorder, alcohol abuse, and a personality disorder. These diagnoses provide an explanation for the various problems noted by Bowling's mother and sister. While some of the problems may also be indicative of a low level of intellectual functioning, their existence has little tendency to establish mental retardation, given Bowling's other diagnoses and the fact that the psychological evidence is inconsistent with mental retardation.

Most damaging to Bowling's claim that he is mentally retarded are the results of evaluations conducted by the two psychologists who examined him before the trial. Dr. Smith, the court-appointed psychologist who evaluated Bowling over two days and through a variety of psychological instruments, concluded that "T.C. is not mentally retarded." He diagnosed Bowling as suffering from alcohol abuse, personality disorder, and attention deficit hyperactivity disorder. Bowling's attorneys also retained a psychologist, Dr. Beal. Dr. Beal did not specifically indicate whether or not he thought Bowling is mentally retarded. However, he did find that Bowling's level of intellectual functioning fell "in the low average range of intellectual functioning." He also diagnosed Bowling as suffering from major depression, personality disorder, and alcohol abuse, but these disorders "were not of such severity to cause him to be substantially impaired in his ability to know the wrongfulness of the acts alleged."

Bowling's claim that he is mentally retarded must also be considered in context. Bowling raised this argument for the first time in the months preceding his execution date, after the Supreme Court declined to review his first habeas petition. Yet, Kentucky law has prohibited the execution of the seriously mentally retarded since 1990, before his case went to trial. Additionally, *Penry v. Lynaugh*, while not categorically prohibiting execution of the mentally retarded, held that "the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background," including evidence that the defendant is mentally retarded. 492 U.S. 302, 328 (1989). The evidence Bowling presents to this court was also available well before his trial, as it consists mainly of his family's observations, school records, and I.Q. tests administered in the seventh grade and before trial. If Bowling is in fact mentally retarded, he likely would not have waited fourteen years to present this argument only in connection with a request for a second or successive habeas petition.

While *Atkins* did create a new rule prohibiting the execution of the mentally retarded, it does not appear that its mandate affected Kentucky law in particular, because Kentucky already prohibited the imposition of this sentence on the "seriously mentally retarded." Further, the test enunciated in *Atkins* for defining who is mentally retarded, *see* 536 U.S. at 308 n.3, is remarkably similar to the Kentucky statute; both require significantly subaverage intellectual functioning, limitations in adaptive functioning, and an onset before adulthood. Thus, *Atkins* did not significantly alter Bowling's ability to present his claim that he is mentally retarded under Kentucky law.

Under either Kentucky law or *Atkins*, Bowling has failed to establish a prima facie case on his mental retardation claim. None of his I.Q. scores falls below the cutoff of 70 established by the Kentucky statute. Evidence that he has limitations in functioning does not show that he is mentally retarded; rather, these limitations are just as indicative of the other psychological disorders from which he suffers as they are of low level intellectual functioning. Thus, we deny Bowling's application.

III.

Bowling also appeals from a federal district court order denying his motion to reopen his first habeas corpus proceeding. Bowling's Rule 60(b) motion asserts two general claims. First, Bowling argues that his ineffective-assistance-of-counsel claim should be reopened because of new evidence in the form of a *Brooklyn Law Review* article that he suggests indicates that the jury did not consider the mitigation evidence presented at trial. He also claims that the intervening Supreme Court decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), provides that it is not inconsistent for a defendant to both assert his own innocence and present mitigating evidence. Second, Bowling contends that his *Brady* claim should be reopened based upon the intervening Supreme Court decision in *Banks v. Dretke*, 540 U.S. 668 (2004), and because the prosecution allegedly committed fraud on the court by failing to reveal exculpatory evidence.

The district court initially construed Bowling's motion as a second or successive habeas corpus petition, which cannot be filed in the district court without prior authorization from a federal court of appeals. *See* 28 U.S.C. § 2244(b)(3)(A). Rather than transferring the case to this court for consideration, however, the district court alternatively held that Bowling did not satisfy his burden under Rule 60(b) and denied the motion. The district court declined to grant a certificate of appealability. Bowling now requests a certificate of appealability from this court.

In *Gonzalez v. Crosby*, 125 S. Ct. 2641 (2005), the Supreme Court explained how to differentiate a true Rule 60(b) motion from an unauthorized second or successive habeas corpus petition. The Supreme Court explained that a movant presents a "claim" under 28 U.S.C. § 2244 if the motion "attacks the federal court's previous resolution of a claim *on the merits*, since alleging that the court erred in denying habeas relief on the merits is effectively indistinguishable from

alleging that the movant is, under the substantive provisions of the statutes, entitled to habeas relief." *Id.* at 2648. By contrast, it held that such a "claim" is not present in a true Rule 60(b) motion, which instead "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Id.*

We hold that the district court properly determined that Bowling's Rule 60(b) motion was in fact a second or successive habeas petition under *Gonzalez*. However, the district court failed to comply with its obligation to transfer the case to this court. *See In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997). Thus, we construe Bowling's Rule 60(b) motion as an application for permission to file a second or successive habeas petition. Bowling is not entitled to file a successive habeas petition because he seeks to re-litigate claims previously raised in his initial habeas petition, which is not permitted under 28 U.S.C. § 2244(b)(1). Further, his claims are without merit and thus do not justify granting leave to file a second or successive petition for habeas corpus.

IV.

For the foregoing reasons, we deny both of Bowling's applications for an order authorizing a federal district court to consider his second or successive petition for a writ of habeas corpus.

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I respectfully dissent from Part II of the majority's opinion, as I would grant Bowling permission to file a second or successive habeas corpus petition and issue a stay of execution pending final determination of his mental retardation claim.

Bowling has filed with this court an application to file a second or successive habeas corpus petition pursuant to 28 U.S.C. § 2244 and a petition requesting a stay of execution pending final determination of his mental retardation claim. To obtain this court's permission to file a second or successive federal habeas corpus petition, the applicant must make a prima facie showing that the application satisfies the statutory requirements. 28 U.S.C. § 2244(b)(3)(C); *In re Green*, 144 F.3d 384, 388 (6th Cir. 1998). A prima facie showing requires the applicant to set forth "sufficient allegations of fact together with some documentation that would 'warrant a fuller exploration in the district court.'" *In re Lott*, 366 F.3d 431, 433 (6th Cir. 2004) (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)). I conclude that Bowling has made such a showing.

Although the Supreme Court held in *Atkins v. Virginia*, 536 U.S. 304 (2002), that the execution of mentally retarded persons violates the Eighth Amendment, the Court did not explicitly define which persons qualify as mentally retarded under the Eighth Amendment, rather "leav[ing] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17 (1986)) (second and third alterations in *Atkins*). Twelve years prior to the Supreme Court's decision in *Atkins*, the Commonwealth of Kentucky by statute abolished the death penalty for "seriously mentally retarded defendant[s]," i.e., persons "with significant subaverage intellectual functioning existing concurrently with substantial deficits in adaptive behavior and manifested during the developmental period." KY. REV. STAT. §§ 532.130, 532.140. However, until Bowling's appeal, judicial review of Kentucky's mental-retardation statute had been quite circumscribed.[1]

In *Bowling v. Commonwealth*, 163 S.W.3d 361 (Ky. 2005), the Kentucky Supreme Court concluded that Bowling was "not entitled to relief from his death sentence . . . ." *Id.* at 366. Specifically, the court ruled that, although *Atkins* applies retroactively with respect to persons tried before Kentucky enacted its statutory ban on execution of mentally retarded persons, *see id.* at 371, Bowling waived his mental-retardation claim because he was tried after the effective date of the Kentucky mental-retardation statute but had chosen not to raise the issue at trial. *See id.* at 372. The court went on to state, though, that if Bowling could prove that he was mentally retarded, he would be actually innocent of the death penalty, and thus the "miscarriage of justice" exception to procedural default would apply. *See id.* at 372-73.

Ultimately, the court declined to grant Bowling's request for an evidentiary hearing because Bowling had failed to make a prima facie showing that he was mentally retarded under Kentucky

---

[1] *See Woodall v. Commonwealth*, 63 S.W.3d 104, 116 (Ky. 2002) (upholding trial judge's limitations on voir dire questioning regarding mitigating factors such as low I.Q., noting that defendant's I.Q. scores of 74 and 78 "are 4 to 8 points respectively higher than the definition of a seriously mentally retarded offender as found in KRS 532.130"); *Hunter v. Commonwealth*, 869 S.W.2d 719, 722 (Ky. 1994) (concluding that the trial court violated due process by failing to grant continuance to permit further testing of defendant, noting that "the doctor's initial judgment that appellant's I.Q. is most likely in the low 70's. The significance of this information, of course, is due to the fact that an I.Q. of seventy is the lower threshold at which a defendant becomes 'death ineligible' under KRS 532.130(2) and KRS 532.140(1).") (internal quotation marks omitted); *C.I. v. Commonwealth*, No. 2002-CA-001066-DG, 2003 WL 22461730, *2 (Ky. Ct. App. Oct. 31, 2003) (unpublished) (finding that KBIT test did not qualify as a "full scale" testing measure as required by juvenile-sex-offender statute and could not "satisfy the multifaceted requirements of KRS 532.130(2)"); *see also Skaggs v. Parker*, 235 F.3d 261, 273 n.4 (6th Cir. 2000) (stating that § 532.140 was not in effect at time of trial but explaining that, under § 532.140, "the court must determine, prior to trial, whether a defendant is mentally retarded. To this end, the court must evaluate a number of factors, including whether the defendant's I.Q. is 70 or below.").

law. *See id.* at 384 ("We hold that to be entitled to an evidentiary hearing on a claim of entitlement to the mental retardation exemption provided by KRS 532.140(1), a defendant must produce some evidence creating a doubt as to whether he is mentally retarded."). The court determined that Kentucky Revised Statute § 532.130 mandates that a defendant have "an intelligence quotient (I.Q.) of seventy (70) or below," but that the lowest IQ score Bowling had ever received was a 79. *See id*. The court further noted that, although there was some confusion whether Bowling received a 74 or an 84 on a 1966 IQ examination, "the relevancy of an IQ score of 74 at age thirteen would be clearly outweighed by Appellant's IQ scores of 79 measured five months later, and 86 and 87 measured twenty-four years later and in the same time frame as the offenses and the trial." *Id.* at 384 n.37 ("If a trial court found otherwise, we would deem that finding to be clearly erroneous."). The court also ruled that Kentucky's statutory framework for adjudicating mental-retardation claims complies with *Atkins*, rejecting Bowling's arguments that, *inter alia*, the Kentucky statutes define only severe mental retardation and that an IQ ceiling of 70 fails to account for margins of error in IQ tests and for increases in IQ scores as a person ages. *See id.* at 376-77.

Justice Keller, joined by Justice Graves, filed a dissenting opinion. First, Justice Keller stated that *Atkins* claims should not be deemed waived when a defendant fails to comply with Kentucky's statutory requirement that mental-retardation issues be raised prior to trial, given that the Eighth Amendment claim arises only after conviction and that society has an independent interest in mentally retarded persons not being executed, which the defendant cannot waive. *See id.* at 385-86 (Keller, J., dissenting). Justice Keller also expressed his belief that Bowling had presented "sufficient [evidence] to create a doubt as to his mental condition," noting that the record was ambiguous as to whether Bowling had received a 74 or an 84 on his November 1966 IQ exam and that it was the province of the trial court to resolve this factual issue in the first instance. *See id.* at 387 (Keller, J., dissenting). Justice Keller further noted that the Kentucky statute required an IQ of 70 or below, not an IQ *score* of 70 or below, and thus a judge should make an independent determination of a defendant's IQ based on the entirety of the evidentiary record (taking into account such matters as margins-of-error and age-based scoring patterns) rather than depending strictly on an examination score. *See id.* at 388 (Keller, J., dissenting).

After reviewing the Kentucky Supreme Court's decision and the parties' briefing, I believe that Bowling has made a sufficient showing to obtain leave to file a second or successive habeas petition. The Kentucky Supreme Court's rejection of Bowling's mental retardation claim rested exclusively on the fact that Bowling had not presented any evidence that he had ever received an IQ test score of 70 or below. *See id.* at 384. However, there appears to be considerable evidence that irrebuttable IQ ceilings are inconsistent with current generally-accepted clinical definitions of mental retardation and that any IQ thresholds that are used should take into account factors, such as a test's margin of error, that impact the accuracy of a particular test score.[2] As then-California Supreme Court Justice Janice Rogers Brown explained in *In re Hawthorne*, 105 P.3d 552, 557-58 (Cal. 2005):

> With respect to the intellectual prong of [California's mental retardation statute], respondent Attorney General urges the court to adopt an IQ of 70 as the upper limit for making a prima facie showing. We decline to do so for several reasons: First, unlike some states, the California Legislature has chosen not to

---

[2] Kentucky's mental retardation statute was enacted in 1990 (i.e., prior to *Atkins*) and appears to have relied on the 1983 version of the AAMR's mental retardation definition. *Bowling v. Commonwealth*, 163 S.W.3d 361, 374 (Ky. 2005); *see* Peggy M. Tobolowsky, *Atkins Aftermath: Identifying Mentally Retarded Offenders and Excluding Them From Execution*, 30 J. LEGIS. 77, 138 (2003) ("As is abundantly clear, . . . *Atkins* changed the landscape of death penalty jurisprudence. Definitions and procedures that were adequate for a mental retardation determination for purposes of a state execution ban are not necessarily adequate for the enforcement of the *Atkins* constitutional execution ban.") (internal quotation and footnotes omitted).

> include a numerical IQ score as part of the definition of mentally retarded. . . . Moreover, *statutes referencing a numerical IQ generally provide that a defendant is presumptively mentally retarded at or below that level, rather than–as respondent impliedly argues–that a defendant is presumptively not mentally retarded above it.* Second, *a fixed cutoff is inconsistent with established clinical definitions and fails to recognize that significantly subaverage intellectual functioning may be established by means other than IQ testing.* Experts also agree that an IQ score below 70 may be anomalous as to an individual's intellectual functioning and not indicative of mental impairment. (*See* Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed.2000) pp. 41-42.) Finally, *IQ test scores are insufficiently precise to utilize a fixed cutoff in this context*. (*See id.* at p. 41 [indicating IQ scores are considered to have a five-point measurement error]; AAMR, Mental Retardation: Definition, Classification, and Systems of Support (10th ed.2002) p. 57; Am. Assn. of Mental Deficiency, Classification in Mental Retardation (8th ed.1983) p. 11.)

(emphasis added, citations and footnote omitted); *see also State v. Lott*, 779 N.E.2d 1011, 1014 (Ohio 2002) ("While IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination on this issue. We hold that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70."); *cf. Ford v. Wainwright*, 477 U.S. 399, 417 (1986) ("[T]he lodestar of any effort to devise a procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the factfinding determination. The stakes are high, and the 'evidence' will always be imprecise.").[3]

While it is true that *Atkins* vests states with the primary responsibility for defining mental retardation, states are not wholly unfettered in this process. Rather, states must adopt mental-retardation definitions and procedures for ascertaining a defendant's mental capacity that are in

---

[3] *See* Tobolowsky, *supra* note 2, at 95-96 ("[M]any states have incorporated a specific IQ cutoff score in their definitions of mental retardation, most often using an IQ of seventy as the cutoff for this component of the mental retardation definition. However, most of these definitions do not acknowledge that each assessment instrument has a standard measurement error, usually between three and five points, and that the standard measurement error is not the same for all instruments. Recognizing the impact of the standard measurement error, in the previous AAMR definitions and the current APA definition, the IQ cutoff for mental retardation has been quantified between seventy and seventy-five, as noted by the Court in *Atkins*. To avoid mistaken reliance on and potential misuse of a particular IQ score, especially if it does not include consideration of standard measurement error, the AAMR stated its current IQ cutoff in terms of being at least two standard deviations below the mean of the specific instruments used, considering their particular standard measurement error, strengths, and limitations. The current APA definitional material also refers to the IQ cutoff as being approximately two standard deviations below the mean, with reference to measurement error of approximately five points. Thus, *any state's use of a fixed IQ cutoff score, without reference to standard measurement error and other factors concerning the specific instrument used, risks an inaccurate assessment of the intellectual functioning component of the mental retardation definition.*") (emphasis added, footnote omitted); *id.* at 139 ("[S]tates that use a rigid IQ cutoff score of seventy for the intellectual functioning component may be excluding some individuals otherwise falling within the accepted clinical definition."); Bob Egelko, *California Judging If A Killer is Retarded: State's Justices Set Framework on Executions*, S.F. CHRON., Feb. 11, 2005, at B1 ("[Mental health] organizations stopped using IQ scores as decisive measures more than a decade ago but consider an IQ of 70 to 75 — below all but 1 to 3 percent of the population — to be evidence of retardation."); James W. Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Issues*, 7 & nn.18-19, *at* http://www.aamr.org/Reading_Room/pdf/state_legislatures_guide.pdf (last accessed July 20, 2005) ("IQ scores alone cannot precisely identify the upper boundary of mental retardation. Generally, mental retardation encompasses everyone with a score of 70 or below. Additionally, it includes some individuals with scores in the low 70s (and even mid-70s), depending on the nature of the testing information. As much as the criminal justice system might prefer to have a hard-and-fast limitation measurable by a single IQ score, it is simply impossible to exclude consideration of other factors about the testing performed on the individual, nor is it possible to ignore the need for clinical judgment by experienced diagnosticians.") (footnotes omitted).

accordance with the Eighth Amendment's goals and principles. Thus, I would grant Bowling leave to file a second or successive habeas petition so that the district court and this court can consider whether Kentucky's definition of mental retardation and its procedures for evaluating such a claim encompass the whole "range of mentally retarded offenders about whom there is a national consensus," *Atkins*, 536 U.S. at 317, and if not, whether Bowling qualifies as mentally retarded when all of the record evidence (not simply his IQ scores) is considered.

With respect to Bowling's motion for a stay of execution, 28 U.S.C. § 2251 provides that:

> A justice or judge of the United States before whom a habeas corpus proceeding is pending, may, before final judgment or after final judgment of discharge, or pending appeal, stay any proceeding against the person detained in any State court or by or under the authority of any State for any matter involved in the habeas corpus proceeding.
>
> After the granting of such a stay, any such proceeding in any State court or by or under the authority of any State shall be void. If no stay is granted, any such proceeding shall be as valid as if no habeas corpus proceedings or appeal were pending.

Bowling has filed an application with this court seeking permission to file a second or successive habeas corpus petition asserting that his execution would violate the Eighth Amendment, and thus a habeas corpus proceeding is pending for purposes of § 2251. *Cf. McFarland v. Scott*, 512 U.S. 849, 859 (1994) ("[A] capital defendant may invoke this right to a counseled federal habeas corpus proceeding by filing a motion requesting the appointment of habeas counsel, and . . . a district court has jurisdiction to enter a stay of execution where necessary to give effect to that statutory right."). Thus, in order to ensure that Bowling's Eighth Amendment claim can be heard by a federal court before he is executed, I would order that Bowling's execution be stayed until further notice.

ENTERED BY ORDER OF THE COURT

/s/ Leonard Green

Clerk