RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOSEPH D. MURPHY,

    *Petitioner-Appellant,*

  *v.*

STATE OF OHIO,

    *Respondent-Appellee.*

Nos. 00-4558; 06-4428

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 96-07244—David A. Katz, District Judge.

Argued: October 29, 2008

Decided and Filed: January 8, 2009

Before: NORRIS, COLE, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Pamela J. Prude-Smithers, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Holly E. LeClair, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Pamela J. Prude-Smithers, Kathryn L. Sandford, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Holly E. LeClair, Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

COLE, Circuit Judge. Petitioner-Appellant Joseph D. Murphy ("Murphy") seeks habeas relief from his conviction and death sentence for the murder and robbery of his elderly neighbor, Ruth Predmore. He appeals from a federal district court opinion and order denying both his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 and his motion to alter or amend the district court's judgment. *Murphy v. Ohio*, No. 3:96-cv-

7244, 2006 WL 3057964 (N.D. Ohio Sept. 29, 2006) (denying petitioner's habeas claims but certifying his *Atkins* claim for appeal); *Murphy v. Ohio*, No. 3:96-cv-7244 (N.D. Ohio Nov. 9, 2000) (Doc. No. 136) (denying petitioner's motion to alter or amend judgment). The district court certified four claims for appellate review. Because we conclude that these claims are without merit, we **AFFIRM** the district court's denial of Murphy's petition for habeas relief.

## I. BACKGROUND

### A. Facts[1]

Ruth Predmore, seventy-two years of age and in frail health, resided alone at 887 Davids Street in Marion, Ohio. Defendant-appellant, Joseph D. Murphy, resided with his parents at 1049 Davids Street, was acquainted with Mrs. Predmore and had performed yardwork for her in the past.

Mrs. Predmore was a member of the philanthropic organization known as the "Kings Daughters and Sons[.]" Since approximately 1983, the organization had collected pennies to support its charitable activities. As treasurer of the organization, Mrs. Predmore maintained custody of the pennies and other funds of the organization (which exceeded $100) at her home. The pennies were not in rolls, but were instead retained loose by Mrs. Predmore.

In mid-January 1987, [Murphy] told his girlfriend, Brenda Cogar, that he intended to write a note to Mrs. Predmore demanding money, and threatening her with death if she did not comply. On January 27, 1987, Mrs. Predmore visited a Lawson's store in her neighborhood near the intersection of Davids Street and Bellefontaine Avenue. While at the store, she talked to Janice Colby, a sales clerk, and displayed to her a note which she had received. The note stated as follows:

> "You don't have no phone. I want your money. put it in a bag and put it in your yard or i'll kill you tonite.
>
> "No money

---

[1]Because Murphy filed his habeas petition after the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, we review his claims to determine whether the "state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000). In so doing, we rely on the Ohio Supreme Court's determination of the facts as set forth in *State v. Murphy*, 605 N.E.2d 884, 888-90 (Ohio 1992). We review de novo all issues not reached by the state courts. *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006).

"No life

"Tonite at 8:00"

On February 1, 1987, at approximately 7:00 p.m., [Murphy] left his parents' home clad in a blue tee-shirt, blue jeans, tennis shoes, maroon vest and brown jacket with white fleece lining. He went to the Sohio gasoline station on the corner of Davids Street and Bellefontaine Avenue and requested penny wrappers. A clerk provided used penny wrappers. At approximately 9:00 p.m., [Murphy] telephoned his mother and informed her that he had found a credit card.

That same evening, between 9:00 p.m. and midnight, Mrs. Predmore was killed by a five-inch knife wound to her neck. The knife severed the trachea, the esophagus, and the right and left carotid arteries and jugular veins.

At approximately 10:30 p.m., [Murphy] returned home. Although his hands and face were covered with blood, he displayed no cuts or bruises on his body. There was no blood on his clothing. He explained that the blood was the result of a fight. Thereafter, he went to the bedroom of his brother Michael where they counted pennies and placed them in paper rolls. The next morning, [Murphy] had a black bag of pennies in paper rolls, some of which he offered his mother to purchase cigarettes. On February 3, 1987, [Murphy] entered Lawson's store, showed the manager some rolled pennies in a dark bag and asked whether she would exchange the coins for currency. The manager declined.

Jackie Valentine was a supervisor for the Homemaker and Chore Program of the Marion County Department of Human Services, which delivered meals to the elderly who were unable to leave their homes. On February 2, 1987, Valentine received a telephone call informing her that Mrs. Predmore had not responded when a meal was delivered to her home. Upon arriving at the home of Mrs. Predmore, Valentine entered the unlocked front door and discovered the lifeless body of Mrs. Predmore. Valentine thereafter summoned the Marion city police.

The first officer to arrive, Detective Sammie L. Justice, discovered footprints in blood on the front porch and blood splattered on the screen door and wooden front door. Thereafter, Agents Robert D. Setzer and David Barnes of the Ohio Bureau of Criminal Identification and Investigation ("BCI") searched the Predmore residence. They discovered in the living room the note that Ruth Predmore had previously shown to Janice Colby. Agent Setzer also took blood samples from the shoeprints found on the porch of the Predmore house. Subsequent analysis revealed that the blood was of Ruth Predmore's type.

Meanwhile, as some of the members of the Murphy family were preparing to travel to West Virginia, they noticed the police activity at the Predmore home down the street. [Murphy] appeared agitated and ventured the opinion that Mrs. Predmore must have been murdered. Thereafter, [Murphy] placed a telephone call to Cynthia Nichols, his aunt, and asked her whether he could stay with her for a while at her residence in the Wood Valley Trailer Park in Caledonia, Ohio. After she agreed, [Murphy] and Brenda Cogar departed for Caledonia at approximately 8:00 p.m. After their arrival, [Murphy] admitted to Cogar that he had killed Mrs. Predmore by slashing her throat with a knife he had taken from a collection of his brother.

On February 3, 1987, Detective Wayne J. Creasap discovered a wallet belonging to Mrs. Predmore underneath a shrub, approximately fifty yards south of the Murphy residence.

Thereafter, police searched the Murphy residence and found a pair of gloves, a brown windbreaker jacket with white fleece, a woman's purse, penny wrappers, rolled pennies and writing paper of the type upon which the note found in the Predmore home was written. A subsequent search of the residence revealed a pair of blood-stained blue jeans.

Police then traveled to Caledonia, arrested [Murphy] and advised him of his rights to remain silent and have the assistance of counsel.

At approximately 8:06 p.m., BCI agents searched the house trailer of Cynthia Nichols. Among the items recovered were a pair of tennis shoes and a maroon blood-stained vest. Subsequent analysis of the tennis shoes, the gloves, the jacket, the purse and the blue jeans revealed the presence of Type A blood. While both [Murphy] and Mrs. Predmore had Type A blood, Mrs. Predmore had blood containing a PGM +1 enzyme factor while [Murphy] had a PGM +2 enzyme factor. Sixteen percent of the population have blood of the type and enzyme factor of Mrs. Predmore's. The blue jeans recovered from the home of appellant had blood stains of those characteristics.

Meanwhile, [Murphy] was transported to the Marion police station. Upon arrival, [Murphy] was again advised of his constitutional rights and acknowledged that he understood them. Following both oral and written instructions regarding his rights, [Murphy] executed a written waiver prior to any conversation with police detectives. The subsequent interview was taped and a transcription thereof produced. During the interview, Sergeant John Gosnell of the Marion County Sheriff's Department alluded to prior criminal acts of [Murphy] involving arson and breaking and entering. [Murphy] acknowledged that he had written the note found in the home of Mrs. Predmore, which she had previously shown to Janice Colby.

On February 4, 1987, [Murphy] sent word from jail that he wished to continue the interview.

This second interview was likewise taped and transcribed. At approximately 11:13 p.m., [Murphy] was again advised of his rights and again executed a waiver form. During this interview, [Murphy] denied any involvement in the death of Mrs. Predmore and implicated Alvie Coykendall, his brother-in-law, in the crime. [Murphy] volunteered to submit to a polygraph examination.

On February 8, 1987, police again searched the Murphy residence, and recovered a knife lodged in the concrete foundation of the home. It was part of the collection belonging to David Murphy, [Murphy's] brother. Analysis of the knife revealed traces of blood. Shortly after this search, Murphy's mother discovered a plastic bank card bearing the name of Ruth Predmore under a mattress in a basement bedroom of her home.

*Murphy*, 605 N.E.2d at 888-90.

## B.      Procedural History

### 1.      State Court

On direct appeal, the state court of appeals affirmed Murphy's convictions and death sentence. *State v. Murphy*, No. 9-87-35, 1991 WL 117226, at *21 (Ohio Ct. App. June 26, 1991). On December 30, 1992, the Ohio Supreme Court affirmed the decision of the appellate court. *State v. Murphy*, 605 N.E.2d 884, 909 (Ohio 1992).

In 1994, Murphy filed his first petition for post-conviction relief in the state trial court, which denied the petition without conducting an evidentiary hearing on the matter. The Ohio court of appeals affirmed the trial court's decision, *State v. Murphy*, No. 9-94-52, 1995 WL 275766 (Ohio Ct. App. May 12, 1995), and the Ohio Supreme Court declined further review. *State v. Murphy*, 655 N.E. 2d 184 (Ohio 1995) (Table). Murphy subsequently filed a motion for rehearing in the Supreme Court of Ohio, which was denied in February 1993. *State v. Murphy*, 607 N.E.2d 13 (Ohio 1993). On October 4, 1993, the United States Supreme Court denied Murphy's petition for certiorari. *Murphy v. Ohio*, 510 U.S. 834 (1993) (Table).

In 2002, subsequent to the Supreme Court's ruling in *Atkins v. Virginia*, Murphy filed a second petition for post-conviction relief, asserting that because he is mentally retarded, the imposition of the death sentence violates his Eighth Amendment rights under the United States Constitution. 536 U.S. 304 (2002). On June 30, 2004, after conducting an evidentiary hearing on the issue, the trial court found that Murphy was *not* mentally retarded under *Atkins* and denied his petition for post-conviction relief. The court of appeals affirmed the trial court's decision, *State v. Murphy*, No. 9-04-36, 2005 WL 280446, at *6 (Ohio Ct. App. Feb. 7, 2005), and the Ohio Supreme Court declined further review. *State v. Murphy*, 830 N.E.2d 347 (Ohio 2005) (Table).

### 2.    *Federal Habeas Proceedings*

On December 31, 1996, Murphy filed his initial petition for a writ of habeas corpus, setting forth twenty-three separate grounds for relief. The district court summarily denied Murphy's petition on all counts. *Murphy v. Ohio*, No. 3:96-cv-07244 (N.D. Ohio Sept. 28, 2000) (Doc. No. 130.) Murphy appealed the district court's ruling to this Court, and we remanded the case so that the district court could comply with *Slack v. McDaniel*, 529 U.S. 473 (2000), which requires a detailed certificate of appealability ("COA") analysis as to each claim a prisoner raises in his petition. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001). On December 5, 2001, the district court issued an unpublished memorandum opinion and order granting Murphy a COA on four of his twenty-three claims for relief. *Murphy v. Ohio*, No. 03:96-cv-07244 (N.D. Ohio Dec. 5, 2001) (Doc. No. 147.) The district court also reserved ruling on whether it would grant Murphy a COA for his *Atkins* claim because the State had not yet had the opportunity to brief the issue.

On June 20, 2002, the United States Supreme Court held the execution of a mentally retarded person to be unconstitutional. *Atkins*, 536 U.S. at 304. Murphy then filed his August 29, 2002 motion to hold his federal habeas proceedings in abeyance pending his return to state court. The district court granted Murphy's motion on March 5, 2003 and ordered Murphy to notify it once the state court proceedings were complete. *Murphy v. Ohio*, No. 03:96-cv-07244 (N.D. Ohio Mar. 5, 2003) (Doc. No. 154.) In

2004, the trial court conducted an evidentiary hearing on Murphy's claim, and subsequently determined that he was not mentally retarded, denying his petition. The Ohio Court of Appeals affirmed the trial court's decision. *State v. Murphy*, No. 9-04-36, 2005 WL 280446, at *6 (Ohio Ct. App. Feb. 7, 2005). The Ohio Supreme Court declined further review. *State v. Murphy*, 830 N.E.2d 347 (Ohio 2005) (Table).

When Murphy had fully exhausted his *Atkins* claim in state court, he notified the district court and filed an amended petition under *Atkins*, claiming to be mentally retarded and seeking relief from his death sentence. The respondent filed an amended return of writ on January 10, 2005, to which Murphy filed an amended traverse. After the parties completed their briefings on the issue, the district court issued a September 29, 2006 order dismissing the action but granting Murphy a certificate of appealability on his *Atkins* claim. *See Murphy v. Ohio*, No. 3:96-cv-7244, 2006 WL 3057964, at *5 (N.D. Ohio Sept. 29, 2006). We now turn to consider Murphy's appeal of the four claims that were certified for our review.

## II. JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 2254. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253.

## III. STANDARD OF REVIEW

This Court reviews de novo a district court's decision to grant or deny a petition for a writ of habeas corpus. *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2007) (citing *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004)). Because Murphy filed his habeas petition after the enactment of AEDPA in 1996, AEDPA's provisions apply to his case. *Id*. (citing *Woodford v. Garceau*, 538 U.S. 202, 210 (2003) and *Lindh v. Murphy*, 521 U.S. 320, 336 (1997)).

Under AEDPA, a federal court may grant a writ of habeas corpus with respect to a "claim that was adjudicated on the merits in state court proceedings" if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28

U.S.C. § 2254(d)(1). A habeas petition may also be granted if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. § 2254(d)(2). A state-court decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams*, 529 U.S. at 405. A state-court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id.* at 407-08, or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context," *Seymour v. Walker*, 224 F.3d 542, 549 (6th Cir. 2000).

The AEDPA standard of review, however, applies only to "any claim that was adjudicated on the merits in State court proceedings." *Hartman v. Bagley*, 492 F.3d 347, 356 (6th Cir. 2007) (citing *Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006)). Consequently, where a state court has not previously ruled on the merits of a claim, we apply the de novo standard of review. *Id*.

## IV. ANALYSIS

Murphy bases his appeal on the following four claims for relief: (1) trial counsel rendered ineffective assistance by failing to retain expert assistance to explain both the effects of sexual abuse on children and the impact of Murphy's mental impairments on his functioning, and by providing the prosecution with Murphy's juvenile records and other record evidence of his past antisocial behavior; (2) the trial court improperly instructed the jury members regarding whether they could consider Murphy's "psychological age" as mitigating evidence at sentencing; (3) Murphy is mentally retarded and constitutionally ineligible to receive a death sentence under the law as set forth in *Atkins*; and (4) Murphy's statements to the police were allowed into evidence

at trial in violation of his Sixth Amendment right to counsel.  For the reasons set forth below, we find that none of these claims warrant habeas relief.

A.     **Trial counsel did not render ineffective assistance during the mitigation phase of Murphy's sentencing by failing to retain certain experts or by providing the prosecution with documentary evidence of Murphy's past antisocial behavior.**

Murphy argues that his trial counsel rendered ineffective assistance by failing to retain experts during the mitigation phase of Murphy's sentencing to address (1) the effects of Murphy's having been subjected to sexual abuse in his youth, and (2) his alleged mental retardation.  Murphy also asserts that his counsel improperly disclosed various documents to the prosecution that contained negative information about Murphy. The State counters that this claim should not be considered because Murphy first raised it in his traverse during federal habeas proceedings, and regardless, the denial of the claim by the Ohio Court of Appeals constituted a reasonable application of Supreme Court precedent.

On state post-conviction review, Murphy alleged ineffective assistance of counsel arising from trial counsel's alleged failure to "obtain a mitigation specialist in a timely manner who could have assisted counsel in the preparation and presentation of the mitigation phase of Petitioner's trial, and also provided more information which would have assisted in other phases of [the] trial." (Joint Appendix ("JA") 958.)  In support, Murphy attached two affidavits.  The first affidavit was from Linda Pudvan-Forment, a mitigation specialist, who attested that she became a mitigation specialist in September 1986 and began to work on Murphy's case (her *third* capital case) in May 1987.  Pudvan-Forment's affidavit emphasized that significant time constraints surrounding her preparation of the mitigation evidence prevented her from gaining Murphy's family's trust, from conducting the necessary research, and from securing institutional records pertaining to Murphy's family background and history. The second affidavit was from Dr. Gregory Keck, Ph.D., a licensed psychologist.  Dr. Keck averred that he worked with adolescent victims of sexual abuse, and he stated that, "[t]he

dynamics of Joey Murphy's behavior are consistent with children who are sexually abused, especially his history of fire-setting and animal mutilation." (JA 996.)

Murphy never alleged that trial counsel was ineffective for failing to retain an expert on mental retardation on state post-conviction review.

The Ohio Court of Appeals affirmed the trial court's denial of Murphy's claim, explaining:

> . . . [I]n the instant case, twelve witnesses testified in the mitigation phase of the proceeding, including a clinical psychologist, a worker from the West Virginia Department of Human Services, a school official, and various family members.
>
> The clinical psychologist's evaluation included review of extensive records, both hospital and treatment programs and interviews with family members and appellant. Testimony included descriptions of his childhood living conditions and the physical punishment he received from his parents. Additional testimony described various educational and psychological evaluations.
>
> Furthermore, appellant was represented by two attorneys and had assistance from psychologists, investigators and the Ohio Public Defender. The record further reveals, for example, that juvenile records were requested, numerous pre-trial motions were submitted, and vast amounts of time expended in preparing for the case.
>
> In summary, appellant's affidavits make general assertions. Hence, we cannot find that appellant has met his burden to set forth evidentiary documents which include sufficient facts to show that he was denied effective assistance of counsel.

*Murphy*, 1995 WL 275766, at *6.

In the fifteenth ground for relief in his federal habeas petition, Murphy charged that trial counsel was ineffective for failing to examine and present evidence concerning "deep psychological scars from the abuse [Murphy] suffered as a youth and that that abuse gave rise to the conduct underlying the instan[t] case." (JA 64-65.)

In his traverse, Murphy specifically charged that retaining and presenting the testimony of an expert on sexual abuse "would have corroborated Mr. Murphy's unsworn statement in which he discussed some of the sexual abuse he had suffered."

(JA 399.)  Murphy also submitted that trial counsel should have retained an expert on mental retardation "to relate to the jury how Mr. Murphy, who is mentally retarded, is affected by everyday situations and stressors." (JA 401.)  Additionally, Murphy offered that trial counsel rendered ineffective assistance of counsel by "disclosing to the State documents obtained from the other institutions at which Mr. Murphy had been placed." (JA 402.)

As to trial counsel's failure to retain a sexual-abuse expert, the district court declined to grant relief, writing:

> Petitioner testified in graphic detail as to the instances of sexual abuse which occurred in his home and during institutional confinements.  His testimony was followed by that of the clinical psychologist who explained the various factors which played into his psychological development.  Moreover, Petitioner's testimony, although unsworn, was more likely than not to have been believed by the jury in light of his parents' testimony.

(JA 762.)  As to the absence of an expert on mental retardation, the district court acknowledged that "an expert certainly would have emphasized and perhaps clarified [Murphy's] mental abilities," (JA 764), but nevertheless determined that trial counsel was not ineffective because these records, for strategic reasons, were not admitted into evidence.

To establish ineffective assistance of counsel, a claimant must show that the attorney's performance was "deficient" and that this performance "prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687 (1984).  Deficient performance occurs when the representation falls "below an objective standard of reasonableness." *Id*. at 688; *see also Johnson v. Bagley*, 544 F.3d 592, 598-604 (6th Cir. 2008) (finding that defendant's trial counsel's failure to conduct an adequate investigation of the substantial mitigating evidence produced at trial was objectively unreasonable).

If counsel's actions are "objectively unreasonable" under the circumstances, the court turns to consider prejudice.  *Strickland,* 466 U.S. at 688.  Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different." *Id*. at 694. To show ineffective assistance during the penalty phase of a capital trial, a defendant must show a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death"; "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Slaughter v. Parker*, 450 F.3d 224, 234 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 669). On the other hand, there is an insufficient showing of prejudice where "one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different." *Id*. (citing *Baze v. Parker,* 371 F.3d 310, 322 (6th Cir. 2004)). Finally, this Court has rejected "a requirement that any later-identified cumulative mitigating evidence must have been introduced in order for counsel to be effective." *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005) (determining that counsel did not provide deficient assistance at sentencing by failing to introduce additional mitigating evidence). With this standard in mind, we review Murphy's three ineffective assistance claims.

### 1.     *Sexual-Abuse Expert*

At the mitigation phase of his trial, Murphy provided an unsworn statement regarding his horrific childhood. Murphy stated that beginning at age five, various relatives and family friends sexually abused him. According to Murphy, he was abused by two of his father's friends when he was five years old and repeatedly raped by the son of his baby-sitter when he was between the ages of six and eight. Murphy also told the jury that when he was being held at the Dayton Children's Psychiatric Hospital, an officer took him into seclusion with another inmate, told both of them to disrobe, and photographed them posing in sexually suggestive positions; Murphy also claimed that the officer used physical force to prevent him from escaping.

Trial counsel retained psychologist Dr. Nancy Schmidtgoessling, Ph.D. to evaluate Murphy's mental ability, criminal responsibility, and competency based upon her review of Murphy's past hospitalizations and interviews of both Murphy and his family. Dr. Schmidtgoessling diagnosed Murphy as having "either a borderline

personality disorder with prominent antisocial features or mixed personality disorder. In either case, Mr. Murphy's disorder is severe, chronic, and disabling." (JA 1292-93.) Dr. Schmidtgoessling explained that an individual's development can influence whether he or she develops a personality disorder, and that, generally, the hallmarks of such disorders are "personality characteristics that a person very inflexibly uses across a variety of situations where they are not appropriate to be used. Most people who adjust well and adapt well to life use certain kinds of behavioral strategies in one situation because that's what the environment expects and demands." (JA 1295.) As to Murphy's "borderline personality," Dr. Schmitgoessling opined that such personalities are not ingrained, but rather, "are thought to develop in response to the environment, particularly the social environment, but of course also the physical environment [a person is] in." (JA 1298-99.) She further noted that "the type of experiences [Murphy] had early on were very much influential in his personality assets expressed today. If he had other experiences, I couldn't say what he would be like. But it's clear to me that those experiences very much affect how he looks at himself, how he looks at other people, and how he regulates his behavior . . . ." (JA 1302-03.)

Murphy argues that his trial counsel rendered ineffective assistance by presenting evidence of sexual abuse without offering accompanying expert testimony to explain the impact of that evidence on Murphy's mental health. The State counters that trial counsel's failure to retain a sexual-abuse expert was not ineffective assistance because the jurors heard testimony about the abuse through Murphy's unsworn testimony, as well as through testimony by Dr. Schmidtgoessling and his parents.

In support of his argument that his trial counsel should have presented testimony by a sexual-abuse expert in addition to Murphy's unsworn testimony, Murphy relies on the affidavit of Dr. Julia H. Hawgood, Psy.D., an Ohio-licensed clinical psychologist whose work "involves the assessment and treatment of adults who have been sexually, physically and emotionally abused as children." (JA 646.) Dr. Hawgood based her July 10, 1998 affidavit on her review of extensive background material in Murphy's case; numerous interviews she had with Murphy's family members, friends, neighbors, school

teachers, school administrators, and court personnel; and a three-and-one-half hour clinical interview she had with Murphy on May 29, 1998 while he was housed at the Mansfield Correctional Institution.  She concluded that Murphy suffered significant instances of sexual abuse over the course of his life.  As a result of these incidents, Dr. Hawgood contended that "the defendant's inherent sense of worth was severely diminished, his shame internalized.  His understanding of his body, and thus, himself, was that it was a cheap commodity to be bartered, used by others, but certainly not something that was his to give or withhold with no strings attached.  Sexual submission became a way of surviving." (JA 647.)  Further, Dr. Hawgood concluded that

> the recurrent, forced sexual abuse to which Joseph Murphy was subjected throughout his developmental years had a significantly negative impact on his personality dynamics and resulting behavioral manifestations at the time of the instant offense.  The cumulative effect of repeated sexual abuse, coupled with on-going physical, emotional and verbal abuse in his family of origin, resulted in the young man who exhibited a deep sense of shame and worthlessness, suppressed rage, inability to experience empathy or intimacy, driven to fulfill both psychic and basic functional needs.  Because internal resources, of necessity, had been focused on surviving the abuse with no support from his family of origin, his psychological development was stunted.  He was a young man adrift in the world without a mature, responsible, adult "compass" to govern his actions.

(JA 649.)

Having reviewed the record thoroughly, we conclude that Murphy's claim that his counsel rendered ineffective assistance by failing to call a sexual-abuse expert does not warrant relief.  Dr. Hawgood could not isolate the effects of the sexual abuse from the other troubling aspects of Murphy's life when she characterized him as a "young man who exhibited a deep sense of shame and worthlessness, suppressed rage, inability to experience empathy or intimacy, driven to fulfill both psychic and basic functional needs." (JA 649.)  Though not an identical description, the jury also heard from Dr. Schmidtgoessling that "Murphy doesn't feel quite like the rest of us. He feels very bored by life, that things are sort of dead and empty.  He feels ambivalent, wishing that things were otherwise, but unable to trust others, always expecting that others will reject him.

And so I guess the thing that most strikes me as I talked with him was his emptiness and then his desire for affection and closeness." (JA 1301-02.) Because the two experts reached similar conclusions about Murphy's mental state resulting from his traumatic upbringing, details of which the jury also heard, there is no reasonable likelihood that the outcome of Murphy's sentencing would have been different. *See Getsy v. Mitchell*, 495 F.3d 295, 313-14 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1475 (2008) (citing *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006)).

It is clear that Murphy has suffered severe abuse throughout his life, and undoubtedly, such experiences have had a profound effect on him. Nonetheless, the abuse suffered by Murphy alone does not support granting the relief he requests. In short, because Murphy cannot establish that the finding by the Ohio Court of Appeals that his counsel's failure to appoint a sexual-abuse expert was objectively unreasonable or that the testimony by a sexual-abuse expert would have caused a reasonable juror to give him life rather than death, his claim must fail.

### 2. *Mental-Retardation Expert*

Murphy next contends that trial counsel should have retained an expert on mental retardation to explain to the jury the impact that Murphy's mental incapacities had on his daily functioning. The State contends, however, that in light of the expert testimony actually presented, such an expert would not have affected Murphy's sentence.

As noted *supra*, Murphy did not specifically allege that trial counsel should have retained a mental-retardation expert in state court. Rather, Murphy first raised this claim in his traverse in the federal habeas proceedings, relying on the affidavit of Michael M. Gelbort, Ph.D., a clinical psychologist who conducted a neuropsychological evaluation of Murphy in 1997, several months after Murphy filed his habeas petition. Because Murphy did not present his claims regarding a mental-retardation expert before the state courts, we must review the claim de novo. *See Danner*, 448 F.3d at 376 (applying the de novo standard of review to a claim not adjudicated on the merits by the state court.)

Dr. Gelbort's report indicated that Murphy received a full scale IQ score of 74, receiving scores of 73 and 78 in the test's verbal and performances sections, respectively.  Dr. Gelbort indicated that Murphy "tests out with IQ in the borderline mentally defective range."  (JA 527.)  Dr. Gelbort's report does not offer significantly different information than that presented at trial.  At the mitigation phase, Murphy's counsel presented the testimony of John Minter regarding Murphy's educational background.  Minter earned an undergraduate degree in psychology, a Master's degree in educational psychology, and an Ed.S. both in school psychology as well as in administration.  Though Minter previously worked for three years as a school psychologist for the Marion County Board of Education, at the time of trial, he was employed by the Marion County Board of Education as the Director of Student Personnel where he was responsible for providing educational programs for students.

Minter based his testimony in relevant part on the following evaluations conducted on Murphy by various schools and facilities from 1975 through 1981. Despite the fact that the resulting IQ scores of the evaluations varied greatly over the years, ranging from 54 in 1979 to 86 in 1975, the tests, when considered together, evaluated Murphy's abilities as in the "moderate mentally retarded" or "low range of average ability" categories and suggested that Murphy belonged in "a program for children with emotional problems."  (JA 1277.)  In fact, in 1979, upon the recommendation of the Marion Area Counseling Center ("MACC"), Murphy received home instruction and was no longer permitted to attend school because his emotional problems and his "history of setting fires" made him a possible threat to other students. Minter testified, "initially we of course tried to teach [Murphy] what we call academic skills.  Once a child reaches 16, 17 years of age, we change the emphasis and teach what we call survival skills, especially with children who have major academic deficits."  (JA 1277.)  Murphy remained in the program until his family moved outside of the school district in 1982.

Contrary to Murphy's assertions, Minter's testimony provided the jury with a detailed view of Murphy's educational history and considered the programs employed

by the school system to foster Murphy's intellectual development. In the opening statement, trial counsel endeavored to show the jury that Murphy experienced hardship stemming from his mental limitations:

> Joey Murphy kept inside. Joey Murphy not allowed to be with his brothers. Joey Murphy not allowed to go out and talk to other people. Joey Murphy required to sit, as a baby, in that home, required to stay beside his mother as a shadow all his childhood.
>
> Why? Who knows. It was said he was different. It was said he was sick. They were told he was mentally retarded. Whatever the case was, sick, different, mentally retarded, his brothers and sisters didn't want to be around him cause he was different. His mother wouldn't let him out because he was different, he was sick. He would have to sit, as she stayed in the home, in one place. At night, she would have him sleep at the end of the bed on the floor, in a shack that was held up by upright two-by-fours and tar paper around it. Four rooms, two bedrooms, a living room, and a kitchen. Coal stove in the middle to heat it. So bad that his dad, on occasions, would tell him to go find another place to sleep while his mother was asleep just because it was so cold. You could see the snow through the floor. Little Joey Murphy 4 years old, 5 years old, had to come in the house. And I can't even believe it, but when they tell me – when they tell me and they will tell you, daily to get a beating, to take his pants down and lay on the floor. These are things that you will hear about Joey Murphy. Things in his childhood.

(JA 968-69.)

Additionally, Dr. Schmidtgoessling offered some explanation as to the effects of Murphy's psychological impairments on his intellectual development. She testified that:

> One sees he has not adapted effectively at school, not been able to make the adjustment effectively at school, not been able to make the adjustment to authority, to applying his mental capacities to school the way most kids are able to do. He's not been able to form relationships at all in an age appropriate fashion. He's extremely ambivalent, relationships literally created so much tension [in] him because of his desire for approval and affection. Yet his feeling, it will be rejected. He can't regulate his behavior towards other people. Often times he's very testing and provocative. And at other times, like a child very meek and attention seeking. Work wise, he's not been able to hold a job for a sustained amount of time. If you just look at him in almost any realm of his functioning, he does not behave in a way we would expect a 22 year

old person.  He behaves at a much younger level than that.  That's why I mean by disabling.

Disabling psychology means that you are unable to carry out things that people your age should be able to do.

(JA 1171-72.)

Again, although it is clear that Murphy faced significant challenges during his youth, including the afore-described mental deficiencies, the record before us does not warrant a different conclusion than that reached by the district court.  Trial counsel presented Minter's testimony as a basis for its charge of mental retardation.  Indeed, Minter testified about Murphy's IQ scores and the resultant actions by the school system to address his intellectual needs.  Further, Minter testified that Murphy had tested in a "borderline mentally retarded" range and had even produced an IQ score placing him in the range of being considered "moderate mentally retarded."  Dr. Schmidtgoessling also offered testimony about the ways in which Murphy's behavioral issues and mental limitations have affected him.

Additionally, Murphy submits that testimony by a mental-retardation expert would have been beneficial if only to refute the testimony of James Sunbury, Ph.D., who testified for the prosecution.  Dr. Sunbury testified that he viewed Murphy as being in the borderline mental-retardation range, meaning having an IQ score of between 70 and 80.  However, Dr. Gelbort's affidavit adds nothing more than evidence previously offered at trial.  *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) (explaining that "the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").[2]

Given that Murphy has not demonstrated that trial counsel's failure to retain a mental-retardation expert to explain the impact of Murphy's intellectual limitations upon his life resulted in prejudice, we cannot grant him relief on this claim.

---

[2]Murphy also objects to the district court's alleged "fail[ure] to address [Dr. Everington's] affidavit in reaching its decision," but Dr. Everington's testimony was not available for the district court's consideration at the time that this particular claim was resolved.  Murphy offered Dr. Everington's testimony in support of his *Atkins* claim, which was first raised in 2005, but the district court addressed and rejected the instant claim in 2001.

### 3.       *Disclosure of Records of Past Antisocial Behavior*

As his final argument that his trial counsel provided ineffective assistance during the mitigation phase, Murphy contends that trial counsel improperly disclosed to the government documents and evidence gathered in preparation for the mitigation phase, allowing damaging evidence to be presented to the jury. Murphy argues that counsel was not obligated to disclose its entire mitigation file to the prosecution; rather, the trial court ordered counsel only to mark in advance the exhibits intended for use during the mitigation phase of trial. Specifically, Murphy asserts that due to counsel's allegedly improper disclosure, on cross-examination, Murphy's mother confirmed that Murphy had been unable to attend a group home because he had a history of setting fires and that he had been removed from a treatment facility because he posed a danger to other patients by mutilating animals, damaging cars, stealing, and destroying a counselor's room. Murphy also claims that the prosecution used the records in their cross-examination of Dr. Schmidtgoessling, who testified about certain incidents during which Murphy had been identified as "destructive" while a resident in another treatment facility. The State argues that Murphy's disclosure claim is improperly before this Court, and that, regardless, the argument does not warrant habeas relief.

A petitioner seeking a writ of habeas corpus must meet certain procedural requirements to permit review of his habeas claims by a federal court. *See Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 431 (6th Cir. 2006). The petitioner must first exhaust the remedies available in state court by fairly presenting his federal claims before the state court; the federal court will not review unexhausted claims. *Id.* (citing *Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004); *Lott v. Coyle*, 261 F.3d 594, 601 (6th Cir. 2001)). The exhaustion "requirement is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Lott*, 261 F.3d at 608 (internal quotation marks and citation omitted). A federal court will not review claims that were not entertained by the state court due to either the petitioner's failure to raise those claims in the state courts while state remedies were available or the petitioner's failure to comply with a state procedural

rule, thereby preventing the state courts from reaching the merits of the claims. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Seymour*, 224 F.3d at 549-50).

For noncompliance with a state procedural rule to serve as a bar to habeas review, the state procedure must satisfy the standards set forth in *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). *See Smith*, 463 F.3d at 431. First, there must be a state procedural rule in place that the petitioner failed to follow. *Maupin*, 785 F.3d at 138. Second, the state court must have actually denied consideration of the petitioner's claim on the ground of the state procedural default. *Id.* Third, the state procedural rule must be an "adequate and independent state ground to preclude habeas review." *Id.* If these three factors are satisfied, the petitioner can overcome the procedural default by either "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

We agree with the State's assessment that Murphy's disclosure claim is not properly before this Court because he first presented it in his traverse and, thus, failed to exhaust the claim in state court. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) (a district court may decline to review a claim that a party raises for the first time in his traverse). Regardless, even assuming *arguendo* that Murphy had properly exhausted his disclosure claim, reviewing Murphy's claim de novo, *Danner*, 448 F.3d at 376, Murphy's arguments fail on their merits. First, the production of the records by Murphy's counsel was not objectively unreasonable because the prosecution most likely is entitled to such information under the relevant Ohio Rule of Criminal Procedure, which provides:

> If on request or motion the defendant obtains discovery under (B)(1)(c), the court shall, upon motion of the prosecuting attorney order the defendant to permit the prosecuting attorney to inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions thereof, available to or within the possession, custody

> or control of the defendant and which the defendant intends to introduce
> in evidence at the trial.

Ohio Crim. R. 16(C)(1)(a).

More importantly, however, the documents produced were not prejudicial because they were merely cumulative of potentially damaging information about Murphy that was already presented at trial in support of Murphy's claim that he had a mental illness. Trial counsel tried to demonstrate to the jury that evidence of Murphy's problematic and often destructive behavior supported its theory that he suffered from a mental illness and from possible mental retardation. Specifically, on direct examination, Murphy's mother testified that when Murphy was enrolled in Headstart at the age of five, his teachers contacted her to discuss his habit of starting fires, the fact that he did not get along well with other children and sometimes abused them, and that he was generally badly behaved. Moreover, Murphy's mother testified that Murphy was institutionalized after he had set fire to a house in which he was being tutored by a Caledonia school system representative. Murphy's mother also added that Murphy had served eighteen months in prison for convictions of auto theft and arson.

Finally, no prejudice resulted from the State's cross-examination of Dr. Schmidtgoessling related to the allegedly erroneously disclosed information. When the prosecution questioned Dr. Schmidtgoessling about several examples of Murphy's detrimental behavior, she responded that his behavior reinforced her diagnoses that he suffered from an antisocial personality disorder. Murphy's behavior, therefore, served as a basis for her finding of mental illness, and was not a detriment to Murphy's case.

Because Murphy has not set forth evidence showing that his counsel's assistance was objectively unreasonable or that his counsel's actions prejudiced his case, his claim as to counsel's provision of records to the prosecution also fails.

**B.      The jury was not improperly precluded from considering Murphy's psychological age as mitigating evidence during sentencing.**

During the closing arguments at the penalty phase of Murphy's trial, Murphy's counsel presented evidence that Murphy's development had been hampered such that his actual age (in years) did not represent his psychological age.  Murphy asserts that the trial court erred in failing to properly instruct the jury that it could consider his psychological age to be a mitigating factor at sentencing under sections 2929.04(B)(3) and (B)(7) of the Ohio Revised Code, in violation of his constitutional rights.  The State counters that this Court should reject the claim because Murphy presented this claim to the federal court for the first time in his traverse, and, alternatively, because the Ohio Supreme Court's denial of this claim constituted a reasonable application of Supreme Court precedent.

Section 2929.04(B) of the Ohio Revised Code provides a list of the various mitigating factors that the jury may consider in analyzing the appropriateness of the death penalty in a given case:

> (B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character and background of the offender, and all of the following factors: . . . .

Ohio Rev. Code § 2929.04(B).  Among these factors are, "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law," *id*. § 2929.04(B)(3), "the youth of the offender, *id*. § 2929.04(B)(4), and "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death."  *Id*. § 2929.04(B)(7).  At the end of the mitigation phase, the trial court submitted the following instructions to the jury:

You will also consider all of the evidence as to any mitigating factors included – including, but not limited to the nature and circumstances of the offense, and the history, character, and background of the Defendant.

Mitigating factors are factors that while they do not justify or excuse the crime, nevertheless may be considered by you as extenuating or reducing the degree of the Defendant's blame or punishment. These mitigating factors include but are not limited to the following. One, whether it is unlikely that the offense would have been committed but for the fact that the offender was under duress, coercion, or strong provocation.

Two, whether at the time of committing the offense, the offender, because of mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Three, the youth of the offender.

And four, any other factors that are relevant to the issue whether the Defendant should be sentenced to death.

(JA 1368-69.) During its deliberations, the jury asked about how to consider Murphy's youth, to which the trial court responded:

There's been a question that's been put by the members of the jury to the Court.

On Page 5, charge to the jury, Point 3 in mitigating factors under 3, the youth of the offender. Your question is, "Is youth referring to his chronological age, or psychological age?"

My response to that is that that particular mitigating factor refers to a Defendant's chronological age.

(JA 1371.)

Defense counsel objected to the court's answer and argued that the judge should have instructed the jury members that they could still consider psychological age as a mitigating factor. Murphy now argues that the trial court's answer did not provide the jury with sufficient guidance to allow it to consider Murphy's psychological age as *other* mitigating evidence.

To determine whether jury instructions violated federal due process, "the appropriate inquiry centers on 'whether there is a reasonable likelihood that the jury has applied the challenged instruction' in an unconstitutional manner." *Boyde v. California*, 494 U.S. 370, 380 (1990); *see also Hartman,* 492 F.3d at 363. "The Eighth and Fourteenth Amendments to the United States Constitution dictate that the sentencer in a capital case may not be precluded from considering any relevant circumstance as a mitigating factor." *Mills v. Maryland*, 486 U.S. 367, 371 (1988); *see also Carter v. Bell*, 218 F.3d 581, 594 (6th Cir. 2000). A mitigating factor may constitute "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Relief should be granted "if the instruction 'by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see also Wilson v. Mitchell*, 498 F.3d 491, 514 (6th Cir. 2007).

Murphy first presented this claim as the ninth proposition of law on direct appeal. The Ohio Supreme Court rejected the merits, however, concluding that the trial court's instruction provided an accurate statement of the law and did not preclude the jury from considering Murphy's psychological age under the other statutory mitigating factors." *Murphy*, 605 N.E.2d at 902-03. As was true of his improper disclosure claim, Murphy's jury instruction claim is not properly before this Court because Murphy first presented it on federal habeas review in his traverse, *Tyler*, 416 F.3d at 504. However, the district court declined to give *Tyler* retroactive effect,[3] thus, a discussion of the merits follows.

Though the Ohio Supreme Court noted that the "better practice" would have been for the trial court to instruct the jury that it could consider Murphy's psychological age

---

[3]Declining to retroactively apply *Tyler* to bar Murphy's claim, the district court denied the claim on its merits, explaining:

> In this instance, the jury's question was directed to the third mitigating factor listed in the jury instructions. The trial court's response was directed solely to Ohio Rev. Code § 2929.04(B)(4). The trial court did not, however, preclude consideration of Petitioner's psychological age under the other relevant statutory subsections. Considering the context in which the question was asked and the trial court's specific answer, the Court does not find that the jury was precluded from considering psychological age regarding mitigation.

(JA 740.)

in the context of the other applicable mitigating factors, it ultimately found the trial court's instruction to the jury that only Murphy's chronological age could be considered under Ohio Rev. Code § 2929.04(B)(4) to be a proper statement of Ohio law. *See State v. Landrum*, 559 N.E.2d 710, 718 (Ohio 1990) (citing *State v. Rogers*, 478 N.E.2d 984, 993 (Ohio 1985) (the "youth of the offender" in Ohio Rev. Code § 2929.04(B)(4) refers to a defendant's "chronological age")). Moreover, the instruction did not preclude the jury from considering Murphy's psychological age under the *other* subsections of the statute. Finally, Murphy's argument that the Ohio Supreme Court's decision did not refer to Supreme Court precedent does not make its decision worthy of dismissal because, as we have previously observed, a state-court decision can be found reasonable as long as "neither the reasoning nor the result" of the decision contradicts United States Supreme Court precedent. *See Dennis v. Mitchell*, 354 F.3d 511, 517-18 (6th Cir. 2003) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)). In summation, because Murphy has failed to put forth evidence demonstrating the reasonable likelihood that the jury applied the challenged instruction "unconstitutionally," the Ohio Supreme Court's properly considered *Boyd v. California*, and Murphy's claim does not warrant habeas relief.

C.      **The Ohio Court of Appeals' determination that Murphy is not mentally retarded is not an unreasonable application of federal law or an unreasonable determination of the facts.[4]**

Murphy claims that he is mentally retarded, and that, as such, he cannot be sentenced to death under *Atkins v. Virginia*, 536 U.S. 304 (2002). The State counters that Murphy's *Atkins* claim does not warrant habeas relief because the Ohio Court of Appeals' denial of that claim on the merits was not an unreasonable application of, or contrary to, applicable Supreme Court precedent.

In 2002, in the wake of *Atkins*, the Ohio Supreme Court pronounced Ohio's definition of what constitutes a mentally retarded individual for purposes of execution

---

[4]In its December 5, 2001 memorandum opinion and order, the district court noted that Murphy first raised his mental retardation claim in his traverse. This Court has since held that a district court may decline to review a claim that a party raises for the first time in his traverse. *See Tyler*, 416 F.3d at 504. But given the district court's decision to allow the parties to brief Murphy's *Atkins* claim, this Court should not apply *Tyler* retroactively to bar the same.

ineligibility in *State v. Lott*, 779 N.E.2d 1011, 1016 (Ohio 2002). The *Lott* analysis mirrors the definitions of mental retardation used by the American Association of Mental Retardation ("AAMR") and the American Psychiatric Association ("APA"). *Id.* at 1014-15. Under *Lott*, an individual is mentally retarded if he or she has: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." *Id.* at 1014. Moreover, although the Ohio Supreme Court clarified that IQ tests alone are "not sufficient to make a final determination on this issue . . . there is a rebuttable presumption that a defendant is not mentally retarded if her IQ is above 70." *Id.* (internal citations omitted). Murphy timely filed his *Atkins* claim, and, as such, he bears the burden of proving that he is mentally retarded by a "preponderance of the evidence." *Id.* at 1016.

Murphy first asserted that he was mentally retarded in his twelfth claim for relief in his first state petition for post-conviction relief. In 1995, an Ohio appeals court affirmed the trial court's application of res judicata as a procedural bar to Murphy's claim. *Murphy*, 1995 WL 275766, at \*6-7. Murphy then filed a second petition for post-conviction relief under *Atkins* in 2002. The trial court conducted an evidentiary hearing on the matter in 2004, but found that Murphy was not mentally retarded and denied his petition, reasoning:

> 1. The Defendant does not possess significantly sub-average intellectual functioning which is a necessary requirement to be classified as being mentally retarded.
>
> 2. Even though the Defendant-Petitioner has been evaluated by eight different psychologists, not a single one has diagnosed him as being mentally retarded.
>
> 3. Defendant-Petitioner's IQ has consistently been found to be in excess of 70, which provides a presumption that he is not mentally retarded.
>
> 4. After reviewing the tape recordings of the interviews with the Defendant-Petitioner, this Court cannot conclude that the Defendant-Petitioner lacked adaptive skills such as communication and self-direction. In fact, this Court was impressed with Defendant-Petitioner's

ability to communicate and logically carry on a conversation with the police officers.

5. Any difficulties that the Defendant-Petitioner possesses did have an onset before age 18.

(JA 828-29.) An Ohio appeals court affirmed the decision, *Murphy*, No. 9-04-36, 2005 WL 280446, at *6, and the Ohio Supreme Court declined further review. *Murphy*, 830 N.E.2d at 347.

In 2005, when Murphy amended his habeas petition to include his mental retardation claim, the district court also denied relief, explaining that

> [t]he State courts' findings were not unreasonable because they were based on the testimony of both experts at the hearing. While Murphy chooses to emphasize different portions of the experts' testimony in support of his position, this Court is not free to disregard the [s]tate courts' factual findings merely because some of the hearing testimony at times supported Murphy's mental retardation claim. Instead, the Court finds that there was ample evidence to support the [s]tate courts' findings based on the hearing testimony of Dr. Sunbury, who concluded that Murphy was not mentally retarded, and Dr. Everington, who at various points in the hearing stated that it was difficult to determine whether Murphy had significantly subaverage intelligence.

(JA 926.) Accordingly, we must consider whether the Ohio appeals court's finding that Murphy was not mentally retarded was a reasonable application of and in accordance with Supreme Court precedent. *See Williams*, 529 U.S. at 409.

At the state court evidentiary hearing, Murphy presented testimony by Dr. Caroline Everington, a special educator with extensive training and twenty-five years of experience in working with persons with disabilities, who endeavored to raise doubts about the accuracy of Murphy's IQ scores. Dr. Everington testified about her examinations of eleven separate psychological evaluations of Murphy, conducted from the time he was nine to when he reached age thirty-two. These test results varied greatly. Over the years, Murphy achieved full-scale IQ scores ranging from 54 to 86, and Dr. Everington testified as to the importance of these results, explaining:

> Overall, the battery of neuropsychological tests show indication of minimal brain dysfunction arising most notably in terms of frontal lobe

deficits and temporal lobe impairment. Information processing speed is consistently slowed and Mr. Murphy has difficulty organizing unstructured information efficiently and effectively. Abstract reasoning tasks oftentimes proved to be quite overwhelming to him, leading to impaired logical abilities, poor reasoning, and subsequently poor judgment. These problems arise out of neurocognitive limitations and deficits. Overall, the patient shows indication of having a significant developmental delay in terms of intellectual functioning. He is also showing indication of cognitive and reasoning deficits which effect his ability to function normal in everyday society and interpersonal situations.

(JA 1674.)

Because assessing Murphy's IQ scores was difficult, Dr. Everington emphasized the importance of assessing Murphy's adaptive skills, testifying that such evaluations provide "the best measure[] that we have right now, and what is included is what you would call best practice, or the adaptive behavior scales. . . . And those are skills that are normed on the typical population." (JA 1450.) To conduct her assessment, Dr. Everington used the Scales of Independent Behavior-Revised ("SIB-R") adaptive skills test, which she deemed one of the most "respected instruments" in the area of mental retardation. Dr. Everington also relied on conversations she had with "informants"—Murphy's grandmother, Murphy's brother, and a former social worker—who provided her with their own observations of Murphy's behavior when he was growing up. Because Murphy had been incarcerated for a significant amount of time when Dr. Everington administered the SIB-R, she had to "retrodiagnose" Murphy from the time he was incarcerated, at age twenty-one. Also, given that at the time of Dr. Everington's evaluation, Murphy was already much older than eighteen (the cut-off age for "mental retardation under *Lott*), Dr. Everington was forced to base her SIB-R evaluation on the informants' recollections about Murphy's conduct from twenty-five years earlier.

Summarizing the SIB-R results for the court, Dr. Everington noted that Murphy appeared to function "more like a child . . . but did not maintain the functioning of a household such as paying rent, or . . . [b]udgeting, buying supplies that are needed and those kinds of things." (JA 1463.) Specifically, Murphy did not manage his own

money, did not maintain a checking account or credit cards, and never lived on his own or cared for himself. Also, though Murphy had some rudimentary cooking skills, he did not grocery shop or plan meals. Dr. Everington concluded:

> He has – has had clear deficits in adaptive skills throughout his life. And those deficits are in the mental retardation range. And I would add that they are more significant than you typically see with somebody who has IQ scores in the range that he does. These are much more significant than you typically see with somebody who has IQ scores in the 70s where he does.

(JA 1468-69.)

The State challenged Dr. Everington's interpretation of Murphy's IQ test results and attempted to undermine her assessment of Murphy's limited adaptive skills, focusing specifically on the problems of retrodiagnosis and the possibility that the informants used were providing her with data that would aid Murphy's claims. On cross-examination, Dr. Everington agreed that in a "technical" sense, a diagnosis of borderline mental retardation is not equivalent to a diagnosis of "mentally retarded." Moreover, the State noted that Dr. Everington had testified that because she was neither a psychologist nor a pyschiatrist, unlike the numerous individual who had administered the evaluations on which she had opined—none of whom had diagnosed Murphy as "mentally retarded"—she was *unqualified* to make a diagnosis of mental retardation.

> State: In fact, [Murphy's] been evaluated by seven different psychologists who performed Wechsler I.Q. Tests on him, and not a single one has diagnosed him as being mentally retarded, isn't that correct?
>
> Everington: That is correct.
>
> State: And you're not a psychologist?
>
> Everington: No, I'm not.
>
> State: And you're not a psychiatrist?
>
> Everington: No, I'm not.
>
> State: And you testified from the outset that you, you know, would not be qualified to make the diagnosis yourself? You'd have to rely upon a psychiatrist or a psychologist, did you not?

Everington: I made that statement, yes.

(JA 1478.)

The State then presented the testimony of its own expert, Dr. James Sunbury, Ph.D. a psychologist whose practice includes work in the field of mental retardation. Based on Dr. Sunbury's two evaluations of Murphy—conducted in 1985 and 1987—Dr. Sunbury concluded with a reasonable degree of psychological certainty that Murphy is not mentally retarded but rather has "borderline intellectual functioning," (JA 1521), which translates to having an IQ "in the range of 70-83." (JA 1523.) Unlike Dr. Everington, who testified that adaptive skills are the most important consideration in Murphy's case, Dr. Sunbury argued that IQ scores should be the primary focus of an assessment of an individual's mental abilities:

> State: Now, those [full scale IQ test scores], are they helpful to you in rendering an opinion as to whether or not the Defendant suffers from mental retardation?
>
> Sunbury: Well, they pretty much rule out mental retardation.
>
> State: Why so?
>
> Sunbury: Well, you can't have a valid score in the 80s on IQ tests and be diagnosed with mental retardation.
>
> State: Why not?
>
> Sunbury: Because of the definition of mental retardation is IQ's, full scale IQ's of 70 or below 70, 75 and below scored by the time the person was an adult, before the person was an adult.

(JA 1528.)

Although Dr. Sunbury testified that he had administered an IQ test to Murphy that resulted in a score of 66, he felt that the score was invalid and did not accurately reflect Murphy's abilities because Murphy told Dr. Sunbury that he "was just having some fun" during the Minnesota Multiphasic Personality Inventory test, which had been given on the same day as the IQ test. Dr. Sunbury also explained that although Murphy suffered from other intellectual limitations, such as poor academic performance, conduct

disorder, and antisocial personality disorder, his "functioning in society has always been very poor," (JA 1535), and the foregoing problems and poor scoring on adaptive behavior tests can be the result of "many other conditions" outside of mental retardation. (JA 1535.)  In short, Sunbury concluded that because Murphy's only other IQ score under 70, a 54, was an outlier that was not an accurate estimate of Murphy's abilities and that the rest of Murphy's IQ scores were above 70, he suffers other intellectual limitations, but he is not mentally retarded.

Murphy's *Atkins* claim does not warrant habeas relief.  In the IQ tests administered before he turned nineteen, Murphy received the following scores:  86, 76, 54, 83, 76; and 82.  Of those scores, both Dr. Everington and Dr. Sunbury considered the 54 to be an outlier, and there was no indication that the other evaluations had not already considered the impact that an out-of-date test or some other measurement of error could have on Murphy's full-scale IQ.  *See In re Bowling*, 422 F.3d 434, 437 (6th Cir. 2005) ("[T]here is no indication that the psychologists who administered the IQ tests to Bowling would not have already considered the adequacy and accuracy of the testing mechanisms in calculating his scores or in using these instruments for evaluation in the first place.")  Accordingly, under *Lott*, there is a rebuttable presumption that Murphy's IQ scores prevent him from being classified as mentally retarded.  Further, we do not find it to be an unreasonable evaluation of the facts that the trial court found that the evidence presented at the *Atkins* hearing does not allow Murphy to overcome this presumption.

The lack of clarity as to possible deficits in Murphy's adaptive skills also undermines his claim.  In *Bowling*, petitioner's mother submitted an affidavit containing possible evidence of deficits in his adaptive skills, stating that he was: "slow in learning to walk and in becoming toilet trained"; had scarlet fever when he was three years old and suffered multiple head injuries as both an infant and a teenager; "wandered off as a child and teenager, got into fights, and was a follower"; and "had problems with money, difficulty in keeping jobs, and difficulty maintaining personal relationships." 422 F.3d at 437.  However, we denied petitioner's request to file a second or successive

habeas petition based upon his *Atkins* claim because the information offered by his mother did not indicate mental retardation. *Id*. at 438. We explained,

> These limitations do not state a prima facie case for Bowling's mental retardation claim. Bowling's known, diagnosed psychological problems include attention deficit hyperactivity disorder, alcohol abuse, and a personality disorder. These diagnoses provide an explanation for the various problems noted by Bowling's mother and sister. While some of the problems may also be indicative of a low level of intellectual function, their existence has little tendency to establish mental retardation, given Bowling's other diagnoses and the fact that the psychological evidence is inconsistent with mental retardation.

422 F.3d at 438.

A similar determination can be made here. Dr. Everington's evaluation of Murphy's adaptive skills is unreliable. Though Dr. Everington identified skill deficits she found to be indicative of mental retardation—Murphy's inability to maintain the household or do chores around the house—this information was culled from third parties' assessments of Murphy's abilities *twenty-five years* earlier. Moreover, Dr. Everington acknowledged that Murphy's adaptive skill deficits could be attributed to something other than mental retardation, explaining that "[c]ertainly when you say 'some other mental problem,' you can't separate. He does have a dual diagnosis, and he does have some psychiatric issues as well." (JA 1463.)

Also, though it was not considered at the hearing, other testimony presented at Murphy's trial suggests that Murphy's adaptive skills were more developed than Dr. Everington believed. For instance, Murphy's mother, Stella, testified that Murphy moved out of her house to live with his then-girlfriend, with whom he had a child. Additionally, Dr. McBride, whose report was before the trial court at the evidentiary hearing, stated that "[e]ven though [Murphy] was somewhat unkempt, he has the ability to care for himself and his personal needs." (JA 1684.)

In conclusion, although it is evident that Murphy has severe psychological problems and certain mental deficiencies, these characteristics alone do not make him "mentally retarded" such that his execution would violate *Atkins*. *Lott*, 779 N.E.2d at

1016; *see Bowling*, 422 F.3d at 438 (defendant's psychological disorders, alcohol abuse and personality disorder do not amount to mental retardation warranting the protection of *Atkins*).   Therefore, the Ohio appeals court's resolution of this claim was not an unreasonable application of, or contrary to, Supreme Court precedent, and we must affirm the district court's decision.

**D.     Murphy's Sixth Amendment right to counsel was not violated by the admission into evidence of numerous statements Murphy made to the police**

The last issue before us is whether the trial court should have suppressed various statements Murphy made to law enforcement when he was in police custody.   Murphy asserts that those statements should have been suppressed because the police coerced him into making an involuntary, unknowing, and unintelligent waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), in violation of his Sixth Amendment right to counsel.

On direct appeal, Murphy alleged that the trial court improperly admitted his statements to the police because they used inappropriate interrogation tactics and his mental limitations undermined any conclusion that his statements were voluntary.   The Ohio Supreme Court rejected Murphy's assertions, explaining:

> The transcripts of the interviews reveal that each [round of interrogation] was preceded by warnings, that knowing and voluntary waivers of his right to counsel and privilege against self-incrimination were obtained and the statements he made were the product of his own free choice. This view is underscored by appellant's exercise of his right to cease the interview and consult an attorney on February 3, 1987, and is further bolstered by the evaluation of Dr. Sunbury that "Joseph Murphy has sufficient intellectual understanding of courtroom proceedings in general, and his own legal difficulties in particular.   He also has the ability to cooperate with his attorneys.   However, although he is not mentally retarded and he is not psychotic, he does have a character or personality disorder.   He is unreliable and unpredictable and he may not tell his attorneys the whole truth.   He has fluctuating internal standards and is manipulative. These behaviors represent Mr. Murphy's personality style and are not treatable as mental illness within any reasonable time period."

*Murphy*, 605 N.E.2d at 900.

Murphy again alleged that the trial court improperly admitted his statements to the police at trial as his first ground for relief in his habeas petition. He argued that in addition to the police officers' decision to ignore his mental deficiencies, they also failed to ask him whether he wanted to waive his *Miranda* rights. The district court denied Murphy's claim, finding that he failed to rebut by clear and convincing evidence the presumption that the factual findings of the trial court on the issue of coercion or the validity of the waiver were correct. *Murphy*, No. 03-96-cv-07244 (Doc. No. 130) (N.D. Ohio Dec. 5, 2001).

In *Dickerson v. United States*, 530 U.S. 428, 433 (2000), the Supreme Court acknowledged that there are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." Notably, "[a] statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Miranda*, 384 U.S. at 444). To protect this Fifth Amendment right, an "implied right to counsel" exists "when a suspect is interrogated while 'in custody' or 'otherwise deprived of his freedom in any significant way.'" *Abela v. Martin*, 380 F.3d 915, 925 (6th Cir. 2004) (quoting *Miranda*, 384 U.S. at 444).

"[T]he determination [as to] whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724 (1979) (citing *Miranda*, 384 U.S. at 475-77). The totality of the circumstances can include such factors as "age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as

deprivation of food or sleep." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

Before trial, Murphy moved to suppress his statements to the police, and the trial court conducted an evidentiary hearing. The following five statements were at issue: (1) Murphy's February 3, 1987 statement to Detective Creasap and Sergeant Gosnell; (2) Murphy's February 4, 1987 statement to Detective Creasap accusing Murphy's brother-in-law, Alvie Coykendall, of the murder; (3) Murphy's March 17, 1987 statement to Detective Kauble and Captain Hayden admitting involvement, but claiming that Coykendall committed the actual murder; (4) Murphy's April 9, 1987 statement to Sergeant Black and Detective Layne confessing to the murder; and (5) Murphy's April 13, 1987 statement to Detective Kauble and the prosecutor during which Murphy entered a plea of not guilty by reason of insanity. The details surrounding each of these statements follow.

### 1. February 3 statement

On February 3, Detective Wayne Creasap and Sergeant J. L. Gosnell arrested Murphy at the Wood Valley Trailer Park, and Murphy verbally received *Miranda* warnings while in the police cruiser. At the Marion County Police Department, Murphy was again advised of his *Miranda* warnings, this time, both verbally and in writing. Murphy acknowledged that he understood his rights to silence and to have counsel, but he agreed to sign a waiver form and to participate in an interview.

Murphy specifically agreed to speak with Gosnell, with whom he had a prior relationship. Gosnell testified that he had known Murphy for about five years and knew Murphy "well" given that he "has been involved in several cases that I investigated over the past years, and – involving alleged arsons and thefts." (JA 1156.) Gosnell also added that he and Murphy "have camaraderie, I believe up to a certain point." (JA 1159.) Murphy subsequently ended the February 3 interview by invoking his right to counsel, stating: "I think I'm gonna stop and talk to my lawyer." (JA 547.) The police did not continue to try to question Murphy after that point.

2.      *February 4 statement*

Donald Griffin, a police officer with the Marion City Police Department working as a jailer in the Marion City Jail, testified that on February 4, a jail trustee informed him that Murphy wanted to talk to him.   When Griffin approached Murphy, Murphy indicated that he wanted to confess.  Griffin then requested that another police officer contact the detectives working on the Predmore murder case.  At this point, Griffin knew that Murphy was represented by an attorney, but he testified that since he did not know the attorney's name, he did not contact him.

Creasap, Gosnell, and Captain Frank Arnold were present at the February 4 interview with Murphy.  After being advised of his *Miranda* rights, Murphy indicated that he understood his rights but had decided to speak with the police and executed a waiver form to the effect.  In the interview, which was transcribed, Murphy indicated that he had initiated the contact with the police through the jail trustee.  Murphy also indicated that although he knew that he had a right to counsel, he did not want his attorney to be present.

Notwithstanding any discrepancy as to Murphy's education level—Murphy told Creasap he had only a third-grade education but later informed Gosnell that he had actually completed the ninth grade—Gosnell and Creasap both verbally explained Murphy's rights to him and confirmed that he understood those rights.  Gosnell believed that Murphy understood the consequences of his decision-making and was aware of the possibility of the death penalty in this case.  Gosnell testified that he never made any misrepresentations to or struck any deals with Murphy.

3.      *March 17 statement*

William L. Thatcher, a jailer at the Marion County Sheriff's Department, testified that on March 17, Murphy again indicated that he wanted to discuss his case with a police officer.   Thatcher saw Murphy on a daily basis, knew that Murphy was represented by counsel, and was aware that Murphy's competency and sanity were an issue.  Thatcher conveyed Murphy's request to Jack Kauble and Al Hayden.

Kauble, a police detective for the Marion City Police Department, testified that he interviewed Murphy on March 17 after he had advised of his *Miranda* rights both verbally and in writing, and after Murphy signed a waiver of rights form. Kauble testified that at this interview, Murphy indicated that he did not want counsel present.

### 4.     April 9 statement

On April 9, while Murphy was being prepared to attend a court hearing, told Charles Black, a sergeant in the Marion County Sheriff's Department, that he wanted to talk to a police officer about his case. Murphy specified, however, that he did not want his counsel present. Greg Layne, a detective with the Marion County Sheriff's Department, met with Black and Murphy. Layne advised Murphy of his constitutional rights to silence and to counsel, which Murphy waived. Layne told Murphy that neither he nor Black could advise him or promise him anything; nevertheless, Murphy wanted to meet with the prosecutor after his hearing, and the officers arranged a meeting.

At this meeting of Murphy, Black, Layne, and the prosecutor, Murphy said that he wanted to be sent to the correctional facility in Chillicothe because he had received letters that his life would be in danger in Lucasville. Layne testified that he had known Murphy since Murphy was about sixteen or seventeen years old. Layne also testified that he was "probably" aware of Murphy's capabilities and limitations concerning the ability to know right from wrong and to speak and understand English. Layne also testified that though he knew about Murphy's social and educational background, he was not aware that Murphy's competency and sanity were at issue.

### 5.     April 13 statement

On April 13, Kauble and the prosecutor interviewed Murphy. Kauble advised Murphy of his *Miranda* rights both verbally and in writing, and Murphy signed the waiver of rights form. Kauble had explained the *Miranda* rights to Murphy. Murphy did not want his counsel present, explaining that he was afraid that his attorneys would prevent him from getting his confession over with. Kauble acknowledged that Murphy had entered a plea of not guilty by reason of insanity.

6.      *The totality of the circumstances shows that Murphy's statements were voluntary and that Murphy knowingly and intelligently waived his right to counsel*

Murphy asserts that his statements were involuntary because the police knew of his mental limitations and pressured him to confess to Mrs. Predmore's murder. Significantly, the Supreme Court has acknowledged that recently, "interrogators have turned to more subtle forms of psychological persuasion," resulting in greater emphasis being placed upon the defendant's mental condition when determining the voluntariness aspect of a confession. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *see Smith v. Mullin*, 37 F.3d 919, 935 (10th Cir. 2004) (finding a defendant's mental impairments relevant because they can enhance a defendant's "susceptibility to police coercion"). However, the Court also explained that "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Connelly*, 479 U.S. at 164. Indeed, in *Clark v. Mitchell*, we determined that a borderline retarded defendant had voluntarily confessed where the police read him his *Miranda* rights aloud, and where he affirmed his understanding of those rights after each paragraph, signed a waiver form, and was offered the chance to make corrections to his tape-recorded statements. 425 F.3d at 283. In so doing, we explained that the defendant's "borderline retardation" or "low average intellect" was "not dispositive" on the question of voluntariness, and reasoned, "[o]ur sister circuits have found several instances where defendants, despite their mental retardation or low IQ's, were found to have waived their rights knowingly and intelligently. *Id*. at 283-84 (citing *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998) (holding that defendant's borderline IQ did not prevent knowing and intelligent waiver of rights); *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) (determining that despite defendant's IQ of 78, he gave a valid waiver because he received warnings several times, both while in custody for the crime at issue and for prior crimes); *Rice v. Cooper*, 148 F.3d 747, 751 (7th Cir. 1998) (holding that mildly retarded defendant gave valid waiver because police had no reason to suspect that he did not understand the warnings).

As in *Clark* and the other cases mentioned above, Murphy's low intelligence alone does not make the officers' actions in questioning him coercive. Moreover, though the facts do not suggest that the officers engaged in improper tactics when questioning Murphy, "not all psychological tactics are unconstitutional." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (though officers lied to petitioner to induce his statement and questioning took place in the midnight hours, confession was voluntary where no physical punishments or threats were used, defendant was not denied physical necessities, and the interrogation was not unduly lengthy); *see also United States v. Thomas*, No. 96-6079, 1997 WL 764495, at *2 (6th Cir. Dec. 4, 1997) (confession was voluntary where uniformed, armed officers told the defendant that it would be better if he told the truth but never opined as to defendant's possible punishment or promised him leniency). Thus, because Murphy's mental deficiencies alone do not support his assertions, where Murphy has failed to submit any other reasons that his statements were involuntary, absent police coercion, we find reasonable the conclusion by the Ohio Supreme Court that Murphy voluntarily waived his *Miranda* rights. *See id.* (citing *Spring*, 479 U.S. at 574).

Considering the totality of the circumstances, Murphy cannot support his argument that he did not knowingly and intelligently make his statements to the police. Before Murphy made each statement at issue, the police advised him of his *Miranda* rights, which he acknowledged and waived. Assertions that Murphy may not have understood his rights or the context of the questioning given his age, education, and intelligence are belied by the record. Importantly, Murphy was twenty-one years old and familiar with the procedures associated with police interrogation and the criminal justice process. *See Smith*, 379 F.3d at 934 (defendant's prior experience with the criminal justice system a consideration in determining whether his waiver was knowing and intelligent). Detective Kauble testified that Murphy understood his right to remain silent as well as the fact that any statements could be used against him. Moreover, before he was put in custody for the murder of Mrs. Predmore, Murphy had several experiences with police interviews, during which time he was advised of his *Miranda* rights, acknowledged his understanding thereof, and signed a waiver of rights form.

We have expressed concern about the voluntariness of a confession made by mentally impaired criminal defendant when that impairment is known to the police, noting "[w]hen a suspect suffers from some mental incapacity, such as intoxication or retardation, and the incapacity is known to interrogating officers, a 'lesser quantum of coercion' is necessary to call a confession into question." *See Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002) (quoting *United States v. Sablotny*, 21 F.3d 747, 751 (7th Cir. 1994)). Nevertheless, Murphy demonstrated that he understood the role of counsel as well as the gravity of the situation in which he found himself. During the February 3 interview, Murphy waived his right to counsel because he saw no reason not to talk to Gosnell, and he later independently decided to terminate the interview. At the suppression hearing, Murphy testified: "Only thing I know is every time I get arrested, the Court – I got before the Court. The Judge says I can get a lawyer, so I go ahead and get a lawyer and I just do whatever my lawyer tells me to do." (JA 239-40.) Here, Murphy spoke to the police without the benefit of counsel because he was angry with his attorney for allegedly disparaging the Murphy family; however, Murphy confirmed at each police interview that he understood that he had the rights to remain silent and to have his counsel present. Moreover, when Murphy sought to talk to the police on February 4, March 17, April 9, and April 13, the record shows that he specifically told the officers that he did not want his attorneys present.

Moreover, the fact that Murphy initiated the questioning that led to the majority of the statements at issue further supports a finding that Murphy's waiver was knowing and intelligent. In *Edwards v. Arizona*, 451 U.S. 477, 485 (1984), the Supreme Court held that if an accused requests counsel during an interrogation, the police must cease all questioning "unless the accused himself initiates further communication, exchanges or conversations with [them]." *See also United States v. Ware*, 338 F.3d 476, 480 (6th Cir. 2003). It is undisputed that Murphy sought out the officers before making four of the five statements he wanted suppressed. Murphy testified that he spoke with the police because he wanted to avoid receiving the death penalty and because he wanted to be sent to the Chillicothe, Ohio prison rather than to the Lucasville, Ohio facility where he had been previously threatened with physical harm by another inmate. Murphy added that

he wanted to talk to the police also because he had been in isolation, which "would make someone want to come out no matter what they did." (JA 212.) The evidence also shows that he pleaded guilty in part because he wanted to be removed from isolation and "get this whole thing over with." (JA 214.) Nonetheless, the officers' responses to Murphy's requests to talk cannot be held against them, and the facts do not suggest coercion. Rather, they suggest that Murphy recognized the seriousness of his situation and thought that confessions would help him receive leniency for committing such a heinous crime.

Finally, Dr. Everington's opinion that the Grisso test she administered shows that Murphy's waiver of his rights was not knowing and intelligent does not change our analysis. The Grisso test is "specifically designed to 'assess [] a defendant's comprehension of the Miranda warnings themselves' and 'provid[e] a comparison of the defendant's performance to that of other defendants of various ages and levels of intelligence.'" Thomas Grisso, Instruments for Assessing Understanding & Appreciation of Miranda Rights 4 (1998). Based upon her administration of the test, Dr. Everington opined that Murphy did not fully comprehend *Miranda* warnings or his right to remain silent. She also testified that Murphy's cognitive limitations increased the likelihood that he misunderstood his interactions with the police officers. This Court has not yet determined the reliability of the results of the Grisso test. *See Garner v. Mitchell*, 502 F.3d 394, 414 (6th Cir. 2007), *rehearing en banc granted, opinion vacated* (Jan. 3, 2008). Moreover, Murphy's Grisso test results are inapposite to the district court's factual findings that Murphy's testimony at the suppression hearing indicated that he was simply trying to work out a deal with the prosecution. Therefore, the Grisso test results do not change our decision to uphold Ohio state courts' finding that the officers did not coerce the statements Murphy sought to have suppressed at trial, and we affirm the district court's denial of Murphy's final claim for habeas relief.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the denial of Murphy's petition for a writ of habeas corpus.